## THE GERBEVILLER.

District Court, D. Massachusetts. July 8, 1929.

On Apportionment of Salvage Award
September 30, 1929.

Goodwin, Proctor, Field & Hoar, of Boston, Mass., for libelant.

Putnam, Bell, Dutch & Santry, of Boston, Mass., for petitioner and cargo claimant.

MORTON, District Judge. This is a case of salvage. The Gerbeviller is a five-masted schooner. On November 27, 1928, while on a voyage from Newport News to Newfoundland with a cargo of coal, she got into trouble near the south end of Georges Bank, about 30 miles southeast by east of the Nantucket Lightship. A northwest gale was blowing, she had lost some of her sails, she was leaking, and she signaled for help. The steam trawler Widgeon saw the signals and stood by. At the time the sea was too rough for the trawler to launch a boat. The schooner's own boat was stove, in an effort which her crew made to leave her. About 10 p. m., at the request of the schooner's captain, who called that she was sinking, her crew of 11 men, and also the cat, were taken off by the trawler's boat. As the Gerbeviller did not immediately go down, the Widgeon sent seven men aboard her. They found the steam pump clogged by coal dust, but were able to use the hand pump, and the master of the trawler decided to try to tow the schooner to port. Early in the morning of November 28th a hawser was passed and the towing started. He first headed for New London, but was unable to make any progress against the wind and sea. So he made for Boston, on which course the schooner's remaining sails would draw. A double steel hawser was used. It parted once and was refastened. When the towing was over, it was pretty well used up. The schooner was anchored in the outside harbor of Boston on Thursday evening, and on the following evening in the inner harbor. On the next evening the Widgeon put to sea. The Gerbeviller was sold by the marshal on these proceedings, and the sum realized for her was $1,080 net. The net value of the cargo was $9,745.74. The value of the Widgeon was about $110,000. She carried 22 men, and her value for daily use was about $625 per day.

That the schooner was definitely abandoned is clear; when her master and crew left her, they thought that she was sinking; none of them, except the master, ever again went on board her, and he not until port was reached. Apparently the circumstances did not justify the abandonment; her master and crew evidently became panic stricken when the steam pump clogged. If they had chosen to remain on board, it might have been possible to prosecute the voyage to a successful conclusion. Nevertheless, the fact is that they abandoned their vessel and left her a floating derelict. The B. C. Terry (D. C.) 9 F. 920; The Shawmut (D. C.) 155 F. 476. It was in that situation that men from the trawler went on board. If they had not done so, the schooner would undoubtedly have been a total loss, and, being near the lines of steamer travel, might, before sinking, have become a dangerous menace. It was, perhaps, a rather chancy business to board in a fresh gale and rough sea a vessel whose crew had abandoned her because they thought her about to founder; but beyond that no extraordinary skill or courage was involved, and there seems to have been no unusual difficulty in towing to Boston. Of course, the Widgeon is an unusually powerful vessel. It is by no means certain that the schooner's crew would have been lost, if they had stayed on board her. I therefore do not think that any award should be made for saving life.

The general principles on which salvage awards are based have been long settled. See Murphy v. The Suliote (C. C.) 5 F. 99; Coast Wrecking Co. v. Phœnix Insurance Co. (C. C.) 13 F. 127. In this case the principal elements to be considered are the values of the property saved, and of the property

used in saving it, and the perils from which the salvaged property was rescued. With regard to derelicts it has been said that the salvage award should be liberal. The Flower City (D. C.) 16 F. 866; The Theta (D. C.) 135 F. 129. In The Nord Alexis, 273 F. 160 (C. C. A. 2d), it was said that the primary consideration is the amount of benefit conferred by the salvage service, and in The Minnie E. Kelton (D. C.) 181 F. 237, at page 245, that salvage is a reward for service, not a quantum meruit for labor expended.

Applying these principles: The Widgeon was relatively a valuable vessel, engaged in regular employment, and having large earning power. The cost of the salvage services is estimated by her owners—liberally, I have no doubt—as $1,157. She gave up her employment for two or three days to do this work. There was no other vessel in the vicinity which could have performed it. Without it the schooner and her cargo would have been a total loss. As to the proper amount to award, not much help is to be gained from other decisions because of differences in the circumstances under which the salvage was performed, and also because the decisions are not always consistent. Let there be a decree for $3,500. If the apportionment of it is not agreed to, the case may stand for further hearing on this question.

### On Apportionment of Salvage Award.

■ Upon rehearing the salvage award in this case was increased to $4,000. As the parties were unable to agree as to the apportionment of it between those entitled to share, the case has been further heard upon that point.

■ The Widgeon was in wireless communication with her owner after finding the Gerbeviller, and undertook the salvage on its orders to her captain. Most of the crew of the trawler, including her officers, were on fixed wages, plus a lay. The general supervision of the salvage work, including the rescuing of the schooner's crew, was in charge of Fahey, the Widgeon's mate. Three of her crew, Crowe, O'Toole, and Whiffin, manned the lifeboat which took the crew from the schooner after the latter's boat had been stove, in an attempt to launch it. This work involved both effort and risk, which should be recognized. After the schooner's crew had been taken off, Fahey and Eustace boarded her to look her over and make fast the towing lines. This also involved an element of risk. Crowe, Powers, Fowler, O'Toole, O'Brien, Jackman, and Ray went on board as a salvage crew, and remained there until the schooner was anchored in the inner harbor at Boston. The work which they did was arduous, but I do not gather that it involved any serious danger. After the schooner's arrival at Boston Harbor on Friday evening, Eustace and Whiffin stayed on board about 20 hours, presumably as an anchor watch, perhaps also to keep possession of the vessel.

The complete out-of-pocket expenses of the owners of the Widgeon for 5½⁄₁₀ days which she was actually away from her fishing, amounted to $1,157.05. This they ought, of course, to receive. I see no reason why the fishermen on her should lose the amounts of their lays because she undertook this salvage operation. If her crew be given their wages, and those entitled to a lay an additional amount equal to an average lay, those who did not participate in the salvage work will be as well off as if she had continued fishing. I see no reason why they should be awarded more. In addition to these amounts, the members of her crew who actually participated in the salvage ought to receive awards for that service, which was outside their line of duty.

Applying these principles, the master of the Widgeon had general charge of the salvage work, acting, however, as has been said, not on his own initiative, but under orders from his owner. He incurred no personal risk or exposure. His award is fixed at $100. Fahey, the mate, who was actively in charge of the operations, is awarded the same amount. Crowe and O'Toole, who went in the lifeboat, and were also members of the salvage crew, are awarded $75 each. Whiffin, who went in the lifeboat and acted as anchor watch, is awarded $60. Eustace, who went on board the schooner with Fahey to look her over, and also served as anchor watch, is awarded $50. The other men comprising the salvage crew, namely, Powers, Fowler, O'Brien, Jackman, and Ray, are awarded $30 each. All these amounts are to be in addition to the wages and estimated lays, as to which I accept the figures submitted by counsel for the Widgeon. There is no conflicting evidence, and the figures given do not appear inherently improbable. The total amounts of the lays, figured on a five-day basis, is $663.65. The total amount of the salvage awards to the crew is $610. These sums, in addition to the $1,157.05 before mentioned, amount to $2,430.70. The balance of the salvage award of $4,000, amounting to $1,569.30, is awarded to the owner of the Widgeon.

■ The cargo owners contend that the entire value of the vessel should be exhausted

before the cargo is resorted to for the payment of salvage. Since the Gerbeviller was abandoned at sea, as above stated, neither the owners nor the crew have displayed the slightest interest in her, the crew never returned to duty even after the vessel reached harbor, and the owners have filed no appearance or claim in this proceeding. There is in this case no assertion by anybody of ownership underlying the lien of the salvors. On these facts, I think that the vessel should be treated as abandoned to the salvors, and that the net proceeds from the sale of her should be applied to the salvage award. The balance of the award should be charged against the cargo.

A schedule of the amounts to be paid to the different members of the Widgeon's crew is annexed.

Ordered accordingly.